FILED
2020 Sep-28  PM 12:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **DARRELL WILLIAMS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  7:19-cv-00301-MHH** |
| | } | |
| **ANDREW SAUL,** | } | |
| **Commissioner of the** | } | |
| **Social Security Administration,**[1] | } | |
| | } | |
| **Defendant.** | | |

## <u>MEMORANDUM OPINION</u>

Darrell Williams seeks judicial review of the Commissioner of Social Security's final adverse decision under 42 U.S.C. §§ 405(g) and 1383(c).  The Commissioner denied Mr. Williams's claims for disability insurance benefits and supplemental security income.  For the reasons below, the Court remands the Commissioner's decision because the ALJ failed to consider environmental limitations in determining Mr. Williams's RFC.

---

[1] The Court asks the Clerk to please substitute Andrew Saul for Nancy A. Berryhill as the defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.  *See* FED. R. CIV. P. 25(d) (When a public officer ceases holding office, that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

## I.   PROCEDURAL HISTORY

Mr. Williams applied for disability insurance benefits and supplemental security income. (Doc. 7-4, pp. 3, 17). He alleges his disability began on January 1, 2017. (Doc. 7-4, pp. 3, 17). The Commissioner initially denied Mr. Williams's claims. (Doc. 7-4, pp. 2, 16). Mr. Williams requested a hearing before an administrative law judge or ALJ. (Doc. 7-5, p. 9). The ALJ issued an unfavorable decision. (Doc. 7-3, pp. 13–27). The Appeals Council declined Mr. Williams's request for review, making the Commissioner's decision final for this Court's judicial review. (Doc. 7-3, p. 2); *see* 42 U.S.C. §§ 405(g) and 1383(c).

## II.   STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and his 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510–11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether substantial evidence in the record supports the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, a district court may not "decide

the facts anew, reweigh the evidence," or substitute its judgment for the ALJ's. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If a district court finds an error in the ALJ's application of the law, or if the court finds the ALJ provided insufficient reasoning to demonstrate the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

## III.   SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

The ALJ found that Mr. Williams had not engaged in substantial gainful activity since the alleged January 1, 2017 onset date. (Doc. 7-3, p. 19). The ALJ determined that Mr. Williams suffered from the following severe impairments: degenerative disc disease and status post lumbar fusion. (Doc. 7-3, p. 19). The ALJ determined that Mr. Williams suffered from the following non-severe impairments: a seizure on February 9, 2018, obstructive sleep apnea, right shoulder injury, right forearm/wrist lacerations from May 2019, asthma/chemical exposure, and mental impairment. (Doc. 7-3, pp. 19–22). After reviewing the medical evidence, the ALJ concluded Mr. Williams did not have an impairment or combination of impairments that meet or medically equal the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 7-3, p. 22).

The ALJ determined Mr. Williams had the residual functional capacity – RFC – to perform sedentary work with some limitations. (Doc. 7-3, p. 23). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(a), 416.967(a). "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. §§ 404.1567(a), 416.967(a). "Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a),

416.967(a).  The ALJ found that Mr. Williams could "constantly reach, handle, finger, and feel."  (Doc. 7-3, p. 25).

Given this sedentary RFC, the ALJ determined that Mr. Williams could not perform his past relevant work.  (Doc. 7-3, pp. 25–26).  Relying on a vocational expert's testimony, the ALJ found other jobs existed in the national economy that Mr. Williams could perform, including order clerk, lens inserter, and eye drop assembler.  (Doc. 7-3, p. 26).  Accordingly, the ALJ denied Mr. Williams's application for benefits.  (Doc. 7-3, p. 27).

## IV.  ANALYSIS

Mr. Williams contends he is entitled to relief from the ALJ's decision because the ALJ failed to include appropriate restrictions and limitations in determining Mr. Williams's RFC.  (Doc. 13, p. 5).  The Court begins its analysis with a review of Mr. Williams's medical records and then considers whether substantial evidence supports the ALJ's RFC finding.

### A. <u>Mr. Williams's Medical Records</u>

Following his alleged onset date of January 1, 2017, on March 13, 2017, Mr. Williams went to DCH Regional Medical Center in Tuscaloosa, Alabama, to seek treatment for severe back pain that was radiating down into his legs and pain in his right shoulder.  (Doc. 7-12, p. 51).  Mr. Williams told Dr. Hinda Greene that he had fallen down stairs one week earlier.  (Doc. 7-12, p. 51).  Mr. Williams described the

pain as "sharp and popping." (Doc. 7-12, p. 51). After examining Mr. Williams's spine, Dr. Greene determined that Mr. Williams was suffering from "unremarkable" old fusion changes—resulting from a 2015 spinal fusion—and had no new disease or fracture. (Doc. 7-12, p. 56; Doc. 7-10, p. 5). Dr. Greene found evidence of severe chronic disc degeneration at discs C5–C6, less severe chronic disc degeneration at discs C6–C7, and moderate degeneration at discs C7–T1. (Doc. 7-12, p. 58). Dr. Greene noted the presence of "minimal facet arthritis." (Doc. 7-12, p. 58). Mr. Williams was prescribed Ketorolac Tromethamine[2] and Orphenadrine Citrate[3] and told to return if he was not improving within a few days. (Doc. 7-12, p. 60).

On March 20, 2017, Mr. Williams visited Dr. Rip Alexander at Whatley Medical Center in Tuscaloosa, Alabama, and complained of back and shoulder pain. (Doc. 7-10, p. 3). Mr. Williams reported that he had experienced lower back pain since 2015, that he had experienced severe lower back pain for two months, and that he had fallen down stairs one week earlier. (Doc. 7-10, p. 5). Dr. Alexander assessed Mr. Williams as having "[c]hronic bilateral lower back pain, with sciatica presence

---

[2] Ketorolac is used to treat pain. https://www.drugs.com/ingredient/ketorolac.html (last visited June 15, 2020).

[3] "Orphenadrine is a muscle relaxer . . . used together with rest and physical therapy to treat skeletal muscle conditions such as pain or injury." https://www.drugs.com/mtm/orphenadrine.html (last visited June 15, 2020).

unspecified . . ."  (Doc. 7-10, p. 5).  Dr. Alexander prescribed Tramadol (50 mg tablet every 8 hours as needed).[4]

During his visit to Dr. Alexander, Mr. Williams also reported acute pain in his right shoulder, and he stated that he had been unable to lift his right arm.  (Doc. 7-10, p. 5).  Dr. Alexander assessed Mr. Williams as having acute right shoulder pain and prescribed Meloxicam (15 mg tablet once daily).[5]  (Doc. 7-10, p. 5).  Dr. Alexander also diagnosed Mr. Williams with essential hypertension, commonly called high blood pressure.  (Doc. 7-10, p. 5).  Dr. Alexander gave Mr. Williams Clonidine .1 in the office and prescribed Lisinopril (10 mg tablet once daily).[6]  (Doc. 7-10, p. 5).

Mr. Williams returned to Whatley Medical Center on April 3, 2017 complaining of hypertension.  (Doc. 7-10, p. 6).  Dr. Alexander refilled Mr. Williams's Lisinopril prescription and continued to monitor his condition.  (Doc. 7-10, p. 8).  Mr. Williams stated that the Meloxicam and Tramadol were helping with his pain.  (Doc. 7-10, p. 8).  Mr. Williams reported he was still experiencing right

---

[4] "Tramadol is a narcotic-like pain reliever... used to treat moderate to severe pain in adults." https://www.drugs.com/tramadol.html (last visited May 29, 2020).

[5] "Meloxicam is used to treat pain or inflammation caused by rheumatoid arthritis and osteoarthritis in adults."  https://www.drugs.com/meloxicam.html (last visited May 29, 2020).

[6] "Clonidine lowers blood pressure by decreasing the levels of certain chemicals in your blood." https://www.drugs.com/clonidine.html (last visited June 15, 2020). "Lisinopril is an ACE inhibitor... used to treat high blood pressure (hypertension) in adults and children who are at least 6 years old."  https://www.drugs.com/lisinopril.html (last visited May 29, 2020).

shoulder pain and expressed interest in Charity Care at UAB.  (Doc. 7-10, p. 8).  Mr. Williams was given a Ventolin inhaler refill.  Mr. Williams used the inhaler to treat asthma which Mr. Williams developed as a result of industrial chemical inhalation. (Doc. 7-10, p. 8).[7]  Dr. Alexander encouraged Mr. Williams to exercise.  (Doc. 7-10, p. 8).

Mr. Williams returned to DCH Regional Medical Center on May 2, 2017 to receive treatment for a laceration on his right forearm.  (Doc. 7-12, p. 42).  Mr. Williams received six sutures and six skin staples.  (Doc. 7-12, p. 47).  Mr. Williams returned to DCH three days later to have the laceration examined again.  (Doc. 7-12, p. 34).  The treating physician reported no sign of infection or "concerning findings." (Doc. 7-12, p. 38).

Mr. Williams was admitted to DCH on May 18, 2017 for dizziness, dehydration, acute kidney injury, and uncontrolled hypertension.  (Doc. 7-9, pp. 6, 15).  Mr. Williams told Dr. Anand Prakash that he had been experiencing fatigue and dizziness while doing yardwork.  (Doc. 7-11, p. 20).  Mr. Williams reported that lying down in bed exacerbated his lower back pain, and Dr. Prakash noted Mr. Williams "ambulate[d] a good bit."  (Doc. 7-11, p. 20).  Dr. Prakash recommended that Mr. Williams stop taking Norco 10-325, Lisinopril, Meloxicam, and Ketorolac

_____

[7] "Ventolin FHA is used to treat or prevent bronchospasm, or narrowing of the airways in the lungs, in people with asthma or certain types of chronic obstructive pulmonary disease (COPD)." https://www.drugs.com/ventolin.html (last visited May 29, 2020).

Tromethamine. (Doc. 7-9, p. 7). Dr. Prakash recommended that Mr. Williams continue taking Ventolin and Advair. (Doc. 7-9, p. 7).[8] Mr. Williams agreed to this treatment plan. Mr. Williams received a prescription for Mapap (325 mg, 2 tablets every four hours as needed). (Doc. 7-9, p. 7).[9] Mr. Williams was discharged on May 20, 2017 with instructions to make a follow-up appointment at the Maude Whatley Clinic. (Doc. 7-9, p. 6).

On August 8, 2017, Mr. Williams was admitted to the SpineCare Center for a back-pain evaluation. (Doc. 7-10, p. 25). On August 10, 2017, Dr. Rick Thomason performed a caudal epidural injection under fluoroscopy. (Doc. 7-10, p. 37).[10] Mr. Williams tolerated the procedure well. (Doc. 7-10, p. 37).

Mr. Williams visited Whatley Medical Center on August 24, 2017. He complained of increasing back pain, hypertension, and a seven-year-old rash. (Doc. 7-10, p. 10). Mr. Williams reported he had received a nerve block at the SpineCare Center on August 10, 2017, and was due to receive a second, but could not afford to

---

[8] "Advair HFA inhalation is a steroid and bronchodilator combination medicine that is used to prevent asthma attacks." https://www.drugs.com/mtm/advair-hfa.html (last visited June 15, 2020).

[9] Mapap, or acetaminophen, is a pain reliever "used to treat many conditions such as headache, muscle aches, arthritis, backache, toothaches, colds, and fevers." https://www.drugs.com/mtm/mapap.html (last visited June 15, 2020).

[10] A caudal injection (referred to by doctors in the medical record as a "nerve block") is a procedure injecting a steroid medication into a patient's lower back to provide long-term pain relief. https://my.clevelandclinic.org/health/treatments/16852-caudal-injection (last visited June 15, 2020).

continue visiting the Center.  (Doc. 7-10, p. 12).  Mr. Williams was prescribed Norco 7.5 (1 tablet every 12 hours as needed) to help alleviate his pain.[11]  (Doc. 7-10, p. 13).  Mr. Williams also was prescribed Cephalexin for his rash.[12]  (Doc. 7-10, p. 12).  Dr. Alexander refilled Mr. Williams's other prescriptions and noted that Mr. Williams was not wheezing.  (Doc. 7-10, p. 12).

On September 27, 2017, Mr. Williams received a physical examination at Bear Creek Family Practice.  (Doc. 7-9, p. 40).  Dr. Fawad Aryanpure found Mr. Williams had spine/lumbar "pain without limitation of [range of motion], no other abnormality."  (Doc. 7-9, p. 43).  On October 31, 2017, Mr. Williams received another wellness exam from Bear Creek.  (Doc. 7-9, p. 54).  Dr. Aryanpure noted Mr. Williams had unlabored breathing, and Mr. Williams denied shortness of breath. (Doc. 7-9, pp. 54, 56).

Mr. Williams received a disability evaluation from Neuropsychology Clinic, P.C. on November 10, 2017.  (Doc. 7-9, pp. 45–47).  Dr. Mark L. Prohaska evaluated Mr. Williams's complaints of depression and anxiety.  (Doc. 7-9, p. 45).  Dr. Prohaska noted Mr. Williams was alert and functional during the interview.  (Doc.

---

[11]   "Norco is used to relieve moderate to moderately severe pain." https://www.drugs.com/norco.html (last visited May 29, 2020).

[12] "Cephalexin is used to treat infections caused by bacteria, including upper respiratory infections, ear infections, skin infections, urinary tract infections and bone infections." https://www.drugs.com/cephalexin.html (last visited June 15, 2020).

7-9, p. 46).  After performing a full mental evaluation, Dr. Prohaska concluded that Mr. Williams's mental health was not a severe inhibiting factor in Mr. Williams's daily life, and Mr. Williams's "daily activities and employability appear to be primarily limited by his physical problems."  (Doc. 7-9, pp. 46–47).

Mr. Williams returned to DCH Regional Medical Center on December 27, 2017.  Mr. Williams reported he was out of pain medication and was suffering from hip and back pain.  (Doc. 7-12, p. 17).  Dr. Kenneth Akalonu diagnosed Mr. Williams with an influenza-like illness that exacerbated his back pain and hypertension symptoms.  (Doc. 7-12, p. 22).  Dr. Akalonu prescribed Norco 5-325 and Tamiflu. (Doc. 7-12, p. 22).[13]  Mr. Williams was also prescribed Tylenol with Codeine #3 (300 mg tablet once every four hours as needed) on December 29, 2017. (Doc. 7-9, p. 65).[14]

On January 29, 2018, Mr. Williams established primary care with Bear Creek. (Doc. 7-9, p. 50).  Mr. Williams received a physical examination with no abnormal findings and was prescribed diclofenac sodium (75 mg tablet twice daily for 30 days), Ultram (50 mg tablet twice daily for 30 days), and gabapentin (300 mg capsule

---

[13]  "Tamiflu is used to treat flu symptoms caused by influenza virus . . . ." https://www.drugs.com/tamiflu.html (last visited June 15, 2020).

[14]  "Tylenol with Codeine #3 is a combination medicine used to relieve moderate to severe pain." https://www.drugs.com/mtm/tylenol-with-codeine-3.html (last visited June 15, 2020).

three times daily for 30 days).  (Doc. 7-9, p. 52).[15]  Mr. Williams's prescription for Norco was discontinued.  (Doc. 7-9, p. 52).

Mr. Williams received an epidural injection from SpineCare Center on February 7, 2018.  (Doc. 7-10, p. 47).  On February 9, 2018, Mr. Williams visited Anchored Chiropractic complaining of pain, discomfort, and loss of range of motion in the cervical and thoracic regions.  (Doc. 7-10, p. 61).  Dr. Blake Baggett found Mr. Williams had postural defects in the cervical and thoracic regions, a loss of cervical and thoracic active range of motion, back spasms, and a "postural deficit of sacral/pelvic tilt."  (Doc. 7-10, pp. 61–62, 70–71).  Dr. Baggett did not expect Mr. Williams to "attain full recovery of [his] symptoms or functional deficits."  (Doc. 7-10, p. 62).  Dr. Baggett described Mr. Williams's gait as abnormal.  (Doc. 7-10, p. 70).  Dr. Baggett concluded that Mr. Williams's "case will take an extended period to arrest this complaint.  Because of the examination and imaging findings, I expect this case to take longer than usual to reach MMI."  (Doc. 7-10, p. 62).  Dr. Baggett

---

[15] "Diclofenac is used to treat mild to moderate pain..."  https://www.drugs.com/diclofenac.html (last visited June 15, 2020).

"Ultram is used to treat modrate to severe pain."  https://www.drugs.com/ultram.html (last visited June 15, 2020).

"Gabapentin is an anti-epileptic drug, also called an anticonvulsant.  It affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain." https://www.drugs.com/gabapentin.html (last visited June 15, 2020).

recommended chiropractic treatment twice per week for four weeks. (Doc. 7-10, p. 63).

On the form that he completed before he saw Dr. Baggett, Mr. Williams rated his back and hip pain as a 10 on a 10-point scale, and he rated his leg pain as a 9. He indicated that at its best, his pain was a level 8. (Doc. 7-10, p. 67). He explained that his pain was severe throughout the day and was triggered by an on-the-job injury in 2012. (Doc. 7-10, p. 64). Mr. Williams reported that shots and pain medication helped relieve his pain, and activity aggravated his pain. He stated that he was very restricted in bending, twisting, climbing stairs, and sitting and standing for long periods. (Doc. 7-10, p. 64).

On February 19, 2018, Mr. Williams received an EEG following a convulsion. (Doc. 7-10, p. 19). The EEG revealed no abnormal findings, but Dr. Thomas Emig did not rule out the possibility of seizure disorder. (Doc. 7-10, p. 19). Dr. Emig noted in Mr. Williams's February 19, 2018 "History of Present Illness" that "[Mr. Williams] had been taking tramadol at the time for chronic back pain. Subsequently has been changed to Norco and GPN." (Doc. 7-10, p. 20).

Mr. Williams returned to DCH Regional Medical Center on July 11, 2018 complaining of severe lower back pain radiating into his left leg. (Doc. 7-12, p. 5). Dr. Chris Sneckenberger found Mr. Williams had a moderate broad-based disc bulge that had been slightly progressing but had no definitive nerve root impingement.

(Doc. 7-12, p. 9).  Dr. W. Elwin Crawford determined there were no concerning findings and prescribed Norco 5-325, Robaxin-750, and Medrol.  (Doc. 7-12, pp. 10-12).[16]   Mr. Williams returned to DCH two days later because his left leg gave out, causing him to fall down the stairs.  (Doc. 7-12, p. 25).  Dr. Akalonu concluded after an examination that Mr. Williams was suffering from "postoperative changes" and had no acute abnormality or significant change.  (Doc. 7-12, p. 29).

## B. Analysis

After reviewing the administrative record, the ALJ found that Mr. Williams could perform sedentary work with some limitations.  (Doc. 7-3, p. 23).  The ALJ gave "great weight" to Dr. Aryanpure's September 20, 2017 consultative physical examination.  (Doc. 7-3, p. 25).  The ALJ found that Mr. Williams's subjective claims of pain and limitations "appear out of proportion" with allegations not supported by the medical evidence.  (Doc. 7-3, pp. 24–25).

Mr. Williams contends the ALJ's RFC determination did not properly account for two of his impairments, namely his chemical-induced asthma and his anxiety and depression.  (Doc. 13, pp. 5, 8–9).  Mr. Williams also contends that the ALJ

---

[16] Robaxin-750, or methocarbamol, is "used to relieve the discomfort caused by acute (short-term), painful muscle or bone conditions."  https://www.drugs.com/cons/robaxin-750.html (last visited June 15, 2020).

Medrol, or methylprednisolone, "prevents the release of substances in the body that cause inflammation" and is "used to treat many different inflammatory conditions." https://www.drugs.com/methylprednisolone.html (last visited June 15, 2020)

erroneously "relied on broad statements made by [Mr. Williams] to draw broad conclusions" not supported by substantial evidence. (Doc. 13, p. 10).

A district court must review an RFC determination with deference and examine whether substantial evidence supports the ALJ's conclusion. "[T]he ALJ will 'assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence' in the case.'" *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004) (quoting 20 C.F.R. § 404.1520(e)). Here, the ALJ pointed to medical evidence that supports the limitations that she included in her RFC determination, but she omitted from her RFC analysis (Doc. 7-3, pp. 23-25) discussion of Mr. Williams's chemical-induced asthma, and at Mr. Williams's administrative hearing, she did not pose to the vocational expert a hypothetical that included Mr. Williams's chemical-induced asthma (Doc. 7-3, pp. 72-76).

In evaluating Mr. Williams's impairments, the ALJ properly pointed to the record of an evaluation at Whatley Medical Center which stated that Mr. Williams believed he was doing well and was not wheezing during the exam. (Doc. 7-3, p. 20) (citing Doc. 7-10, p. 12). The ALJ acknowledged that Mr. Williams was prescribed an inhaler in 2017, and she concluded that Mr. Williams's "asthma is well controlled with medication," so that "this impairment constitutes, at most, only slight abnormalities that cannot reasonably be expected to produce more than minimal, if

any, work-related limitations, and is non-severe." (Doc. 7-3, p. 20). Substantial evidence supports this finding.

Still, the record before the ALJ reflected Mr. Williams's injury from chemical exposure, the long-term impact of such exposure, and the fact that in 2017, Mr. Williams continued to receive treatment for the conditions that he developed after his occupational exposure to ammonia in 2010, namely asthma and a rash. (Doc. 7-7, pp. 22-32; Doc. 7-10, pp. 10-12). So the significant question is not whether Mr. Williams's asthma is a severe impairment but whether his RFC should have prohibited work around hazardous chemicals because such work could trigger his asthma.

> Occupational asthma is asthma that's caused by breathing in chemical fumes, gases, dust or other substances on the job. Occupational asthma can result from exposure to a substance you're sensitive to — causing an allergic or immunological response — or to an irritating toxic substance. . . . *Avoidance of occupational triggers is an important part of management.* Otherwise, treatment for occupational asthma is similar to treatment for other types of asthma and generally includes taking medications to reduce symptoms. If you already have asthma, sometimes treatment can help it from becoming worse in the workplace.

MAYO CLINIC, OCCUPATIONAL ASTHMA, https://www.mayoclinic.org/diseases-conditions/occupational-asthma/symptoms-causes/syc-20375772 (last visited Sept. 25, 2020) (emphasis added).[17] As the ALJ pointed out in her opinion, in determining

---

[17] The ALJ was obligated to make sure she was familiar with the characteristics of occupationally-induced asthma. *See Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security proceedings

Mr. Williams's RFC, she was required to consider "the limiting effects of [Mr. Williams's] symptoms" and "factors that precipitate and aggravate the symptoms (e.g., movement, activity, environmental conditions)." (Doc. 7-3, p. 23).

The November 2016 administrative opinion from Williams's previous application for disability benefits was before the ALJ in this case. (Doc. 7-3, pp. 84-94). In that opinion, the ALJ explored Mr. Williams's October 2010 hospitalization for ammonia inhalation and Mr. Williams's treatment for breathing problems after his release from the hospital, (Doc. 7-3, pp. 87-88), and the ALJ, in his RFC analysis, discussed Mr. Williams's testimony concerning his reaction to "odors such as finger nail polish and household chemicals," (Doc. 7-3, p. 91). The ALJ included in the limitations in Mr. Williams's sedentary RFC "no concentrated exposure to pulmonary irritants." (Doc. 7-3, p. 90). The is no similar consideration of this non-severe impairment in the RFC analysis in this case.

Some courts have concluded an ALJ's failure to include an environmental limitation in an RFC is harmless error. *See, e.g.*, *Trujillo v. Comm'r, SSA*, 818 Fed. Appx. 835, 842 (10th Cir. 2020) (harmless error because one of three jobs identified by VE was not affected by omitted environmental limitation); *Ortiz v. Colvin*, 298

---

are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits, and the Council's review is similarly broad."); *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1356 (11th Cir. 2018) ("[I]n the context of a Social Security disability adjudication," ALJs "are by law investigators of the facts, and are tasked not only with the obligation to consider the reasons offered by both sides, but also with actively developing the record in the case.").

F. Supp. 3d 581, 589–90 (W.D.N.Y. 2018) (harmless error for the ALJ to omit exposure to irritants because of asthma because according to the Dictionary of Occupational Titles for the two jobs the VE provided, neither would expose the plaintiff to the types of environmental limitations imposed by his physician).  Others have remanded for the ALJ to consider whether work existed considering the plaintiff's environmental limitations.  *See, e.g.*, *Lenz v. Berryhill*, No. 17-C-221, 2018 WL 1226111, at *12 (E.D. Wis. Mar. 9, 2018) (remanding so the ALJ could pay "specific attention to plaintiff's maximum possible exposure to dander and other irritants" and "reassess, using reliable vocational evidence, whether work exists for plaintiff given the extent to which she can be exposed to such irritants.").

Because the ALJ in this case did not provide sufficient reasoning to demonstrate she conducted a proper RFC analysis, the Court will do the latter and remand to the ALJ for consideration of Mr. Williams's chemical-induced asthma in the context of her RFC determination and of her examination of a vocational expert. In the absence of hypotheticals including a possible limitation on exposure to pulmonary irritants, the Court cannot determine whether that information would have impacted the jobs the vocational expert identified as available to Mr. Williams in the workforce, so the Court cannot determine whether the omission constitutes harmless error.

As for his mental health, Mr. Williams argues his medical records indicate his depression and anxiety significantly restricted his work. (Doc. 13, pp. 9–10). But the ALJ extensively discussed Mr. Williams's mental condition in her opinion and reasonably pointed to Dr. Prohaska's assessment that Mr. Williams had no mental limitations impeding his ability to work. (Doc. 7-3, pp. 20–21). The ALJ also pointed to evidence in the record indicating Mr. Williams had no difficulty functioning due to his depression or mental health, such as evidence that he attended church and spent time with friends and family. (Doc. 7-3, p. 21). The ALJ's determination that Mr. Williams's mental health is not a severe impairment is supported by substantial evidence in the record, and substantial evidence supports the ALJ's decision to exclude from Mr. Williams's RFC limitations relating to his mental health.

Mr. Williams's argument that the ALJ relied too heavily on "broad statements" (Doc. 13, p. 10) like Mr. Williams's report that he experienced dehydration and dizziness while doing yardwork, (Doc. 7-3, pp. 24–25), is not persuasive. Mr. Williams contends this statement is taken out of context and should not determine whether he is capable of work. (Doc. 13, pp. 10–11). But the ALJ did not use this statement as the sole basis for her conclusion that Mr. Williams was not disabled. The ALJ pointed to several objective medical records which contain information that contradicts Mr. Williams's claims of severe impairment, including

a consultative physical examination that indicated that Mr. Williams had a full range of motion and normal dexterity.  (Doc. 7-3, p. 25).  The discussion of Mr. Williams's statements about yard work appears to be secondary to the ALJ's reliance on substantial medical evidence, and the ALJ did not clearly err in her reliance on either.

In her RFC determination, the ALJ concluded that Mr. Williams was capable of "sedentary work as defined in 20 CFR 416.967(a) except occasional[] climbing of ramps and stairs, but never ropes, ladders, or scaffolds; occasionally balance, stoop, and kneel, but never crouch or crawl; can constantly reach, handle, finger, and feel; and no work around hazardous conditions such as unprotected heights, or moving machinery."  (Doc. 7-3, p. 23).  For each determination, the ALJ pointed to specific pieces of evidence in the record indicating the extent of Mr. Williams's impairments and the type of work he is capable of performing.  Substantial evidence supports the ALJ's analysis of the sedentary RFC and the limitations she expressly included in her RFC.

## V.    CONCLUSION

For the reasons discussed above, the Court remands this matter to the ALJ for further proceedings consistent with this opinion.  The Court will enter a final order separately.

**DONE** and **ORDERED** this September 28, 2020.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE